## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Case No.** |
| | ) |
| **FORTY TERRIER MIX TYPE DOGS** | ) |
| **SEIZED FROM A 12.14 ACRE** | ) |
| **PARCEL ON ROBERT POWELL** | ) |
| **ROAD IN WRIGHTSVILLE,** | ) |
| **GEORGIA,** | ) |
| | ) |
| **Defendants.** | ) |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW the United States of America, by and through Tara M. Lyons, Acting United States Attorney for the Southern District of Georgia, and the undersigned Assistant United States Attorney, and brings this Verified Complaint for Civil Forfeiture *in Rem*, with the following allegations:

## NATURE OF THE ACTION AND BASIS FOR FORFEITURE

1.     This is a civil action *in rem* for the forfeiture of forty terrier mix type dogs (hereinafter, "Defendant Dogs") that were involved in a violation of the animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156.

## THE DEFENDANTS *IN REM*

2.     The defendants *in rem* are forty terrier mix type dogs seized pursuant to a federal search warrant on or about December 9, 2024, from a 12.14 acre parcel of land located on Robert Powell Road in Wrightsville, Georgia.

3.      The Defendant Dogs at issue in the current Complaint are described as follows:

a.      Terrier Mix, USM-001, female, red w/white feet/white socks front (3yr)

b.      Terrier Mix, USM-002, female, black/white chest/paws (2 yr)

c.      Terrier Mix, USM-003, female, red  (2 yr)

d.      Terrier Mix, USM-004, female, blonde (3 yr)

e.      Terrier Mix, USM-005, female, blonde small white on chest (1 yr)

f.      Boxer Mix, USM-006, male, white w/black dappling (1 yr)

g.      Terrier Mix, USM-007, male, black w/white chest and paws (2 yr)

h.      Terrier Mix, USM-008, female, black and white (3 yr)

i.      Terrier Mix, USM-009, female, white w/red patches (3 yr)

j.      Terrier Mix, USM-010, female, black w/white chest/paws (4 yr)

k.      Terrier Mix, USM-011, female, red w/white (5 yr)

l.      Terrier Mix, USM-012, male, red (1 yr)

m.      Terrier Mix, USM-013, female, black w/white (10 weeks)

n.      Terrier Mix, USM-014, female, red (10 weeks)

o.      Terrier Mix, USM-015, male, black (10 weeks)

p.      Terrier Mix,  USM-016,  female,  chocolate/ white  horizontal  stripe  on chest/1 white rear Toe (6 weeks)

q.      Terrier Mix, USM-017,  female, chocolate/very small white patches on chest (6 weeks)

u.   Terrier Mix, USM-018, female, chocolate/ beige white patch on chest, white strip run up to chin, runt (6 weeks)

r.   Terrier Mix, USM-019, male, chocolate/ white arrow facing down on chest, 2 white toes on both rear feet (6 weeks)

s.   Terrier Mix, USM-020, male, chocolate/ little white heart on chest slight under bite. (6 weeks)

t.   Terrier Mix, USM-021, male, chocolate/ white spot on chest (6 weeks)

u.   Terrier Mix, USM-022, male, chocolate/ white trapezoid on chest (6 weeks)

v.   Terrier Mix, USM-023, male, chocolate/ white patch center of chest, slight underbite (6 weeks)

w.   Terrier Mix, USM-024, male, red (2 yr)

x.   Terrier Mix, USM-025, female, red (3 yr)

y.   Terrier Mix, USM-026, male, chocolate (7 yr)

z.   Terrier Mix, USM-027, female, black w/white front paws/ scarred face (3yr)

aa.  Terrier Mix, USM-028, female, black/white toe (5 yr)

bb.  Terrier Mix, USM-029, male, black w/white chest and paws (2 yr)

cc.  Terrier Mix, USM-030, male, black and white (4 yr)

dd.  Terrier Mix, USM-031, male, red w/white chest/front paws (3 yr)

ee.  Terrier Mix, USM-032, male, auburn (2 yr)

ff.  Terrier Mix, USM-033, male, black w/white toes (2 yr)

gg.    Terrier Mix, USM-034, male, red (3 yr)

hh.    Terrier Mix, USM-035, male, black w/white chest toes (3 yr)

ii.    Terrier Mix, USM-036, male, auburn (5 yr)

jj.    Terrier Mix, USM-037, male, blonde (1 yr)

kk.    Terrier Mix, USM-038, female, black w/white, 1 white paw and toes (6 yr)

ll.    Terrier Mix, USM-039, male, black w/white chest (2 yr)

mm.    Terrier Mix, USM-040, female, black with white (6 yr)

4.    The Defendant Dogs are being cared for by a contractor who is providing the dogs with access to veterinary and rehabilitation services.

5.    The Defendant Dogs are subject to forfeiture to the United States pursuant to 7 U.S.C. § 2156(e), as animals involved in a violation of the federal animal fighting venture prohibition codified at 7 U.S.C. § 2156.

6.    Because this Complaint is being filed for the purpose of establishing grounds for forfeiture and providing notice to interested persons, it does not include all of the information known by the Government in connection with the investigation underlying the claims for forfeiture set forth herein.

## JURISDICTION AND VENUE

7.    Plaintiff, the United States of America, brings this *in rem* action in its own right and pursuant to its authority to forfeit the Defendant Dogs.  Pursuant to 28 U.S.C. § 1345, this Court has jurisdiction over an action commenced by the United

States. Additionally, pursuant to 28 U.S.C. § 1355(a), this Court has jurisdiction over any action or proceeding for forfeiture.

8. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b) and 1395 because the acts and omissions giving rise to forfeiture occurred in this district and because the Defendant Dogs were found in this district.

## BASIS FOR FORFEITURE

9. The federal Animal Welfare Act, 7 U.S.C. § 2131, *et seq.*, defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to sell, buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture. 7 U.S.C. § 2156(b).

10. The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(e). Animals "seized under such a warrant shall be held by the United States Marshal or other authorized person pending disposition thereof by the court in accordance with this subsection." *Id.* In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody." *Id.*

11.    The statute also contemplates forfeiture of the seized animals. Specifically,

> [a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

*Id.* The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, or transacts business." *Id.*

12.    As explained below, the Defendant Dogs are animals "involved in violation[s]" of 7 U.S.C. § 2156, and are therefore subject to forfeiture pursuant to 7 U.S.C. § 2156.

## <u>BACKGROUND</u>

13.     Dog fighting is a violent contest in which two dogs that are bred and conditioned for fighting are released by their owners or handlers in a controlled environment to attack each other and fight for purposes of entertainment or gambling.  Fights usually end when one dog withdraws, when a handler "picks up" his dog and forfeits the match, or when one or both dogs die.

14.    Terrier or Pit bull-type dogs are the most prevalent type of dogs used in dog fighting ventures. This is due to their short coat, compact muscular build, and the aggressive temperament that some exhibit toward other dogs.

15.    Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight those dogs that display particular traits.

16.    Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury.

17.    Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively.

18.    Dog fighters can generate substantial income from gambling on dog fights and from the sale and breeding of animals with a fighting lineage.

19.    It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time.  This practice is followed for several reasons.  Dog fighters maintain a stock of dogs at different weights and both sexes because in dog fights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex.  Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match being solicited by an opponent.

20.    Further, dog fighters must possess an inventory of dogs because dogs often die or are badly injured during fights.  Dogs that lose fights or fail to show "gameness" are often killed.  It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

21.    Dog fighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline.  Possessing multiple dogs increases the prospects of owning a dog who will become a Champion or Grand Champion.  Dog fighters also routinely test and evaluate their dogs to determine those that exhibit aggressive behavior, including against their own dogs.

22.    Dog fighters typically do not start setting up matches for a dog until the dog reaches at least eighteen months to two years of age.  Until then, dog fighters may test the dog out by "rolling" it or having the dog participate in short fights to assess the dog's demeanor.  Thus, it is common for dog fighters to possess young dogs who are in the process of being trained to fight and, thus, do not yet have much, if any, scarring.

23.    One sign of dog fighting is the presence of pit bull-type dogs on heavy or excessive chains, or housed individually in pens or crates.  Persons engaged in dog fighting take steps to restrain or isolate dogs used for fighting from one another to prevent them from fighting at unintended times.  They may also keep younger dogs they intend to use for fighting out of reach of other dogs to discourage normal socialization. Heavy chains are used to develop neck strength in dogs used for fighting.

24.    Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears.  Scars from organized dog fights are commonly found on the

face and front legs, as well as on hind ends and thighs.  The majority of the adult Defendant Dogs had scarring and or wounds.

## FACTS

25.      On May 9, 2022, the Crawford County Sheriff's Office (CCSO) received a complaint of numerous dogs barking loudly at the residence of 1362 Old Knoxville Road, Knoxville, Georgia, a residence then being used by Bernard Wallace.  Deputies were unable to contact anyone but noted twenty-seven dogs on chains at the residence.  Deputies also noted two syringes, medicine containers, wound care supplies, a strength enhancer supplement, logging type chains with weights attached, and a rope hanging from a tree with a type of cloth attached to one end.

26.      On September 15, 2022, December 11, 2022, and December 20, 2022, CCSO used a drone with thermal imagery to verify that dogs were still on the property.  Deputies noted approximately fifty blue drums that were being used as dog houses.

27.      On June 24, 2024, deputies were again dispatched to 1362 Old Knoxville Road, Knoxville, Georgia regarding an animal complaint.  Deputies noted thirty-eight pit bull type dogs that appeared to be malnourished.  Below are some of the photographs taken during that visit.



28.    On September 1, 2024, deputies were dispatched to 1362 Old Knoxville Road regarding an entering auto complaint.  Deputies met with Bernard Wallace and his wife Susan Snyder, who told deputies they lived at the residence and that their vehicles were vandalized, and items were stolen.  Deputies noted that the vehicles

were a blue Nissan Sentra with Georgia tag TCU1973 and a silver Honda Accord with Georgia tag SDW0126.

29.    On September 5, 2024, deputies were again dispatched to 1352 Old Knoxville Road in reference to a dog complaint.  Deputies were met with a realtor who was showing the property to a prospective buyer.  The realtor noticed many dogs without food or water and the dogs appeared to be malnourished.

30.    Deputies called animal control to the scene.  Animal control counted thirty-five dogs, three of which appeared to be pregnant.  Animal control noted that the dogs had no water, no food, most had no shelter, several had fur worn off around their necks from the chains, and most appeared malnourished.  Animal control noted items consistent with dog fighting such as flirt poles and rape stand (last picture on bottom right).  It should be noted that a rape stand is something used almost exclusively by individuals involved in dog fighting. Because of the aggression built up in these dogs over time a female, even though she is in heat, will interpret a male dog as a threat and attempt to fight him when he attempts to mate with her.  As a result, it is necessary to restrain the female dog so the male can mate her.  Deputies took the following pictures:





31.    CCSO detectives contacted Bernard Wallace and asked him to come to the property to talk with them, but Wallace stated he worked long hours and would not be able to meet.

32.    On October 17, 2024, CCSO detectives received a call from Johnson County Sheriff's Office (JCSO) concerning many dogs on a vacant parcel of property which was a 12.14 acre parcel of land located on Robert Powell Road in Wrightsville,

Georgia ("parcel of property") that was recently purchased by Bernard Wallace. JCSO and CCSO detectives compared their notes on this case and believe the dogs on the property are the same dogs from 1362 Old Knoxville Road.

33.    JCSO detectives drove by the parcel of property on October 17, 2024, and obtained drone aerial footage on October 18, 2024, and observed numerous dogs tethered with heavy logging chains, no food, no water, and very little shelter. Detectives noted that the dogs appeared to be malnourished.

34.    On October 20, 2024, detectives observed a silver Honda Accord with Georgia tag SWD0126 at the parcel of property. They also noted a large white van that appeared to be delivering more dogs.

35.    On December 19, 2024, a search warrant was executed by U.S. Department of Agriculture, U.S. Marshals, Johnson County Sheriff's Office and Georgia Department of Agriculture on the parcel of property. During the execution of the warrants, the agents observed that the Defendant Dogs were in a condition that was not consistent with that of pet dogs.

36.    The dogs seized from the property were housed in a manner consistent with animals involved in a dog fighting operation. The Defendant Dogs were housed in segregated parts with metal chains attached to ground anchors or stakes. The adult Defendant Dogs were housed so that they could not reach each other. Many were wearing thick collars, which are used to prevent the dogs from getting loose and attacking other dogs. *See* photos below:





37.     The younger Defendant Dogs were housed together in crates. *See* photos below:



38.    All of the Defendant Dogs exhibited either scarring, wounds, pressure sores, or other injuries.  *See* photos below of some.

USM - 025



USM - 008



USM – 30



USM – 038



USM - 40



39.    Many of the Defendant Dogs were underweight, thin, or emaciated. *See* photos below.

USM - 002



USM - 012



USM – 33



USM-036



40.    Many of the Defendant Dogs had dental issues, including chipped, worn, or broken teeth and / or tartar and pale gums.

41.    Most of the Defendant Dogs were abnormally dehydrated.

42.    Since the dogs were taken into custody on December 19, 2024, four of the dogs have passed away.  Their presumed cause of death is starvation prior to the date of the search warrant.  The deceased dogs include:

USM -024 *See* photo below.



USM - 027 *See* photo below.



USM – 30 *See* photo below.



USM – 37  *See* photo below.



43.     At the search warrant execution, agents identified a number of items

commonly associated with an illegal dog fighting operation including:

a.     A rape stand.

 b.     A weight with chains.  This is used by the dog fighters to strengthen the

dog as the collar is affixed to the dog and the dog is forced to pull the

weight along the ground.

c.     Miscellaneous medications.     Dog fighters typically keep such

medications because they hesitate to take their dogs to a licensed

veterinarian for fear of being reported.

d.     Hanging scales. As dogs fight as a certain weight, dog fighters will keep

scales that allow them to weigh the dogs to insure they are at the proper

weight prior to the fight.

e.  The manner in which these dogs were being held, that is, they could each see each other but were not close enough to socially interact or play with each other. This is done to intentionally build aggression in each dog.

44.  As noted above, those involved in dog fighting pursue it with the ultimate goal of having Champion and Grand Champion dogs, which in turn brings prestige and financial reward. To accomplish this, participants must first selectively breed their own "bloodline" or strain of fighting dogs with their preferred combination of specific fighting attributes and traits, such as a mouth of a particular shape, or unusual stamina. Along the way they will cull or weed out all but the most desired dogs, and then breed those together, and so on. This can take years or even decades, and requires a considerable investment of time, physical infrastructure, and resources.

45.  Once a dog fighter has achieved the lineage they seek, it can then take additional years for a particular dog to achieve Champion or Grand Champion status, since the dog must prevail in multiple dog fights, with time in between to heal and recover (if the dog survives). Also, long periods of time can pass between fights while a dog fighter searches for an opponent who has a dog of the same weight and sex, and who is willing to wager the desired amount. Once a dog has achieved Champion or Grand Champion status, the owner will often breed that dog to other Champions or Grand Champions, to keep the cycle going.

46.  Accordingly, it would be typical, and consistent with evidence from prior federal dog fighting cases, for someone involved in organized dog fighting to pursue

it over a long period of time. Federal agents are aware of some convicted dog fighters who pursued the practice for decades. Given the amount of technical knowledge, required preparation, and the delay between when a match is hooked and when it occurs, it is difficult if not impossible for someone to casually obtain a fighting dog and participate in a dog fight as an impulsive, one-time episode.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the Defendants *in rem*; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* be forfeited to the United States of America for disposition according to law; that the Court enter a judgment for costs associated with the care of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(e) should any interested party file a claim for the Defendants *in rem*; and that the United States of America be granted such other relief as this Court may deem just and proper.

This __17th__ day of March, 2025.

Respectfully submitted,

TARA M. LYONS
ACTING UNITED STATES ATTORNEY

*s/Shannon H. Statkus*
Shannon H. Statkus
Assistant United States Attorney
South Carolina Bar No. 70410
P.O. Box 2017
Augusta, GA 30903
(706) 724-0517
Shannon.statkus@usdoj.gov

- 25 -

## VERIFICATION OF COMPLAINT FOR FORFEITURE *IN REM*

I, Special Agent Louis Stewart, with the United States Department of Agriculture, Office of Inspector General, have read the foregoing Complaint for Forfeiture *in Rem* in this action and state that its contents are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This ‖ day of March, 2025.


Louis Stewart, Special Agent
United States Department of
Agriculture, Office of Inspector
General